IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:            :    CASE NO. 12-06177(ESL)

SABANA DEL PALMAR, INC.    :    CHAPTER 11

    : 

   Debtor           : 

_____ :

OPINION AND ORDER

This case is before the Court on the Motion for Relief from Automatic Stay (the "Motion for Relief") filed on September 7, 2012, by the Federal Deposit Insurance Corporation, as receiver for Westernbank Puerto Rico ("FDIC-R"). On September 20, 2012, the Debtor filed its Opposition to the Motion for Relief (the "Opposition"). Thereafter, on October 3, 2012, the FDIC-R filed its Reply to Debtor's Reply to the Opposition (the "Reply"). On December 3, 2012, the Court held a final evidentiary hearing on the Motion for Relief (the "Hearing"). In accordance with the evidence admitted, testimony presented and the arguments of counsel for the interested parties, the Court makes the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

1. The Debtor is a corporation wholly-owned by Gulfcoast Irrevocable Trust IV ("Trust IV"). The Debtor has no employees.

2. Michael Scarfia, Sr. ("Scarfia") is the sole officer of the Debtor and the sole trustee and beneficiary of Trust IV. Scarfia is an experienced real estate developer.

3. The Debtor is a real estate company formed in 1996 for the purpose of purchasing real property and constructing 150 residential units for marketing and resale to third parties in a development located in Bayamon, Puerto Rico, known as Mirabella Village & Club.

4. The Property consists of the 69 remaining unsold units (150 were constructed, and 81 were subsequently sold). Of the remaining 69 units, 19 have been approved by the Court for sale but as of the date of the Hearing the sales had not closed. The Debtor is the owner of the Property.

5. The Debtor is a single-asset real estate company as that term is defined in the bankruptcy code as its only asset is the Property. The Court previously determined that Debtor is a single-asset real estate company and hereby incorporates the findings of fact from that Order.

6. The uncontroverted testimony of the FDIC-R's expert established that the Property is currently valued at $9,920,000 for purposes of the Motion for Relief.

7. Save for some unfinished trim work, the Property is fully built and complete. Accordingly, all that is left to be done in connection with the Property is to sell the subject units.

8. The Debtor financed the construction and development of the Property with financing obtained from Westernbank Puerto Rico ("Westernbank") with the loans that constitute the outstanding debt that is the subject of FDIC-R's proof of claims.

9. On April 30, 2010, the Puerto Rico Commissioner of Financial Institutions closed Westernbank and the FDIC-R was appointed receiver of Westernbank.

10. On March 15, 2012, the FDIC-R filed a Complaint in the U.S. District Court for the District of Puerto Rico seeking to enforce its loan documents against Debtor including, without limitation, a foreclosure of the Property. *See* District Court Case Number 12-1188 (the "District Action").

11. On March 16, 2012, the FDIC-R filed a Motion for Appointment of Receiver in the District Action (Dist. Case. No. 12-1188, Doc. 6) wherein the FDIC-R stated that Debtor had agreed to the appointment of a receiver in previous loan agreements and related loan documents and that the Debtor had threatened to cease payment of certain common area expenses, including the electricity, water and services for the residential units of the Property. The FDIC-R further stated that the Debtor was not actively marketing the Property and was not making payments to FDIC-R. Thereafter, the FDIC-R filed two more Motions for Appointment of Receiver on June 8 and June 28, 2012, both of which were unopposed by Debtor.

12. On July 3, 2012, the District Court entered the Appointment of Receiver attached to the Second Motion for Appointment of Receiver (the "Receiver Order"), which appointed the Receiver as receiver over Debtor's Property and empowers the Receiver to manage the Property, market and

sell units in the Property, and to otherwise operate, preserve, and maintain the Property and any property relating to the Property for the benefit of the Receivership Estate. The Receiver, through its agent Mr. Mario Levine ("Levine"), took possession and control of the Property upon the entry of the Receiver Order on July 3, 2012.

13. Shortly after the Receiver Order was entered, Levine interviewed the President of the Homeowners' Association, Mr. Enrique Rivera, who informed Levine that Debtor had not paid significant amounts of association dues owed. As a result, the association was underfunded and could not afford to hire security, maintain the common areas, and provide lighting on certain parts of the Property, all of which were needed at the Property.

14. Upon the first inspection of the Property, Levine noticed issues with deferred maintenance including painting and sealing problems, water intrusion, stucco cracking, and units not in condition to be sold.

15. The Receiver also took possession of the bank financials and found only $200 in Debtor's bank accounts.

16. At the time the Receiver was appointed by the District Court, Debtor had an unpaid bill for over $112,000 from the Homeowners' Association and $4,500 for property insurance. The FDIC-R subsequently funded the payments.

17. The Receiver learned that Debtor had not been funding any marketing plan immediately prior to the appointment of the Receiver.

18. Debtor sold very few units of the Property since the FDIC-R was appointed receiver of Westernbank on April 30, 2012.

19. After taking possession of the Property, the Receiver funded a marketing plan with funds provided by the FDIC-R and hired Ms. Cecy Alfonso to begin marketing the Property. These efforts directly led to the sale of the nineteen (19) units currently under contract.

20. The Debtor filed for voluntary bankruptcy protection under Chapter 11 of the Bankruptcy Code on Sunday, August 5, 2012 (the "Petition Date").

21. As of the Petition Date, the Debtor owed the FDIC-R $32,070,760.14 on a loan secured by, *inter alia*, a first priority mortgage lien on the Property (the "First Loan") and an additional $8,698,961.45 on a loan secured by an additional lien in, *inter alia*, the Property (the "Second Loan"). The balance owed takes into consideration approximately $27,000,000 paid by the debtor towards the construction loan.

22. The evidence introduced at the Hearing established that the FDIC-R is a first-priority secured creditor and that its liens in the Property are perfected.

23. The Receiver filed motions to approve the sale of nineteen (19) units currently under contract. The Court approved the motion at a hearing on November 7, 2012, and subsequently entered an order on the sales.

24. It will cost approximately $7,200.00 in repairs and finishing work per unit to complete these nineteen (19) sales.

25. The repairs and finishing work on the fifty (50) units not under contract will each cost approximately $9,900.00 per unit to make the units saleable.

26. FDIC-R has funded all necessary expenses of operating the Property since the Receiver took possession of the Property.

27. Debtor's only other secured creditor is Centro de Recaudacion de Ingresos Municipales ("CRIM") with a claim in the amount of $872,851.71, and the only priority unsecured creditor is Municipio de Bayamon with a claim in the amount of $111,131.93.

28. As to unsecured debt, Debtor's schedules and the claims filed show a total of $11,766,471.69 in addition to the amounts owed to FDIC-R, including $9,352,301.00 in amounts allegedly owed to Gulfcoast Irrevocable Trust II, Gulfcoast Irrevocable Trust VI, Gulfcoast Irrevocable Trust XVI, and Gibraltar Construction Company.

29. Based on the value of the Property and pursuant to 11 U.S.C. § 506(a), including insider claims, and FDIC-R's deficiency from the First Loan as unsecured and the entire amount of the Second Loan as unsecured, the FDIC-R holds 92% of the secured claims and 72% of the unsecured claims in this case.

30. Gibraltar Construction Company is wholly-owned by Gulfcoast Irrevocable Trust I.

31. Scarfia is the Trustee of Gulfcoast Irrevocable I and Gulfcoast Irrevocable Trust IV.

32. The Debtor submitted a sketch of a plan of reorganization (the "Sketch of Plan") at the Hearing wherein Debtor proposes to sell the unsold units of the Property over a three-year period. Debtor's Sketch of Plan involves managing the Property and apportioning a percentage of the proceeds of the sales of the units of the Property to unsecured creditors.

33. Further, the Sketch of Plan is contingent on the Debtor obtaining post-petition financing and giving super-priority status to the proposed lender.

34. The Debtor's Sketch of Plan reflects that Debtor's total expenses will amount to $13,545,000 (including paying the FDIC-R a total of $9,920,000 for its secured claim without allowance for a possible 1111(b) election or a different valuation of the collateral at confirmation) during the life of the Sketch of Plan and the total gross sales will amount to a maximum of $19,255,000.

35. The Debtor testified that it could not afford payments to secured creditors in excess of $16,000,000.

36. The Debtor's only source of income will be from the proceeds of the sale of the Property.

37. Scarfia testified that the Debtor would segregate the unsecured creditors by treating the sub-contractors as a separate unsecured class. Otherwise, Debtor offered no evidence regarding the class structure of the proposed plan.

DISCUSSION

The automatic stay provisions of 11 U.S.C. § 362(a) are fundamental to allow a chapter 11 debtor a reasonable attempt to reorganize. The automatic stay acts as an injunction to protect the property of the estate and becomes operative by the mere filing of a bankruptcy petition. In re Soares, 107 F.3d 969, 971 (1st Cir. 1997). Hence, the "automatic" reference in the statutory provision and its effect. The broad scope and strength of the automatic stay in favor of the debtor is balanced by the rights afforded to creditors in 11 U.S.C. § 362(d) - (g). A party seeking relief from the automatic stay must file a motion under § 362(d) and Fed. R. Bankr. P. 4001.

An undersecured creditor may file a motion for relief from stay against property of the estate on the ground that the debtor has no equity in the property and that the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). The party seeking relief has the burden of proving that the debtor has no equity in the property, and the party opposing the relief, generally the debtor, has the burden on all other issues. 11 U.S.C. § 362(g). In this case, it is undisputed that there is no equity in the properties given as collateral to the moving creditor, the FDIC-R. Thus, the issue before the court is whether the debtor has met its burden of establishing that the property is necessary to an effective reorganization.

The Supreme Court in United Savings Association of Texas v. Timbers of Inwood Forest Associates ("Timbers"), 484 U.S. 365, 375-376 (1988), indicated that there be a reasonable possibility of a successful reorganization within a reasonable time. The debtor has submitted a proposed or sketch chapter 11 plan purporting to show that reorganization is feasible. The court must consider if it is indeed a plan that has the reasonable possibility of being confirmed within a reasonable time. The court notes that on December 5, 2012 an Opinion and Order was entered finding that the debtor is a single asset real estate case. Although the Timbers test has been limited by the 1994 amendment to § 362(d)(3) of the Bankruptcy Code with respect to single asset real estate cases, the court finds that such a provision need not be invoked in this case.

FDIC-R succeeded to all right, title and interests of Westernbank in the First Loan and Second Loan, and all documents relating to these Loans pursuant to 12 U.S.C. §§ 1821(d)(2)(A)(i). FDIC-R seeks relief from the automatic stay under both 11 U.S.C. § 362(d)(1) and (d)(2) seeking to enforce its loan documents against Debtor including, without limitation, a foreclosure of the Property in the District Court pursuant to the pending District Action. For the reasons stated below, FDIC-R is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) as Debtor does not have equity in the Property and the Property is not necessary to an effective reorganization:

The Court finds that Debtor has no equity in the Property. FDIC-R, as movant on the Motion for Relief, has the burden to prove that Debtor lacks equity in the Property pursuant to 11 U.S.C. § 362(g)(1). It is undisputed that the Debtor has no equity in the Property as FDIC-R's debts secured

by liens on the Property exceed the value of the property. FDIC-R's debts of over $40,000,000 secured by liens on the Property drastically exceed the Property's value of $9,920,000.

The FDIC-R having met its initial burden of showing that there is no equity in the properties given as collateral to its loans, the Debtor must show that the Property is necessary for an effective reorganization. Pursuant to 11 U.S.C. § 362(g)(2), Debtor has the burden of proof on all issues besides lack of equity in regards to relief from the automatic stay under 11 U.S.C. § 362(d)(2). In particular, Debtor has the burden to prove a "reasonable possibility of a successful reorganization within a reasonable time." In re Anderson, 913 F. 2d 530, 531 (8th Cir. 1990). Debtor's Property is not necessary to an effective reorganization unless Debtor proves a "reasonable possibility of a successful reorganization within a reasonable time." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375–76 (1988). As stated by the Eleventh Circuit, "[f]or property to be 'necessary to an effective reorganization' of the debtor . . . it must be demonstrated that an effective reorganization is realistically possible; the mere fact that the property is indispensable to the debtor's survival is insufficient." In re Albany Partners, Ltd., 749 F. 2d 670, 673, n. 7 (Bankr. 11th Cir. 1984) (Bankruptcy was dismissed and automatic stay annulled where court found it unlikely that Debtor operator of a hotel could implement an effective Chapter 11 reorganization.); In re Snapwoods Apartments of Dekalb County, Ltd., 153 B.R. 524, 526 (Bankr. D. Ohio 1993) (Automatic stay lifted as to secured creditor where Debtor could not demonstrate that successful reorganization was likely as the Debtor's past and current net operating income of apartment complex was considerably less than their projected amount.); In re Canal Place Ltd. Partnership, 921 F. 2d 569, 577 (Bankr. La. 1991) (Automatic stay lifted where Debtor's entire plan was based on avoiding foreclosure while awaiting more favorable economic conditions.); In re Bloomington Investors, Limited Partnership, 114 B.R. 174 (D. Minn. 1990) (Stay lifted where hotel was worth approximately $6,000,000 less than amount of secured claim and Debtor did not meet its burden of effectuating successful reorganization).

The court finds that the Debtor has not met its burden to demonstrate a reasonable possibility of reorganization within a reasonable amount of time. The evidence showed that, Debtor has little possibility of a successful reorganization for the following reasons.

It is unlikely that Debtor can generate enough income to pay the secured debt owed to FDIC-R, particularly if FDIC-R makes an 11 U.S.C. § 1111(b) election, in which case Debtor is required to treat the entire amount of FDIC-R's claim as secured, without regard to the value of the Property. See In re Jones, 152 B.R. 155, (Bankr. E.D. Mich. 1993) ("[A]n undersecured creditor can defend itself against strip down by making the § 1111(b)(2) election, which generally permits the creditor to maintain secured status with respect to its entire claim, rather than in an amount equal only to the collateral's value."); In re Griffiths, 27 B.R. 873, 876-77 (Bankr. D. Kan. 1983) (Creditor's § 1111(b)(2) election prevents a "cram down" of creditor's secured claim). Specifically, Debtor's assets are worth far less than the amount of FDIC-R's secured claims. If Debtor were to "operate," Debtor would not be able to generate more than the value of the unsold units of the Property, which are completely encumbered by FDIC-R. Therefore, all income received by Debtor through the sale of its properties would be directed to satisfy FDIC-R's right to payment based on its secured claim. *See* 11 U.S.C. §1129(b)(2)(A)(1) (absolute priority rule as it applies to secured creditors); see also In re Swedeland Development Group, Inc., 16 F. 3d 552, 567 (3d Cir. 1994) (Court "will not hold that a debtor can achieve an effective reorganization by diminishing the value of its pre-petition creditor's lien interest" and where "the net present value of" Debtor's anticipated cash flow "would be insufficient to satisfy" secured creditor's claim.). Debtor testified that the maximum amount that can be generated from the sales of the Property is $19,000,000, which pales in comparison to the amount of $40,769,721.59, which is the amount owed by Debtor to FDIC-R that is secured by liens on the Property. In addition, in view of the uncontested $9,920,000 value of the Property, the Debtor's $19,000,000 estimate is suspect, and if proven true at confirmation, would suggest the true value of the Property is higher than $9,920,000, and FDIC-R's secured claim would thus be higher. Further, in the event FDIC-R makes an election under § 1111(b) in connection with both of the Loans or just the First Loan, Debtor admits that it would not be able to present a feasible plan to the Court as

Debtor would be required to treat FDIC-R's electing claim as fully secured under 11 U.S.C. § 1111(b)(2) and pay FDIC-R at least $32,070,760.14 and potentially $40,769,721.59. According to Debtor's own testimony, there is absolutely no chance that Debtor can generate enough income from the Property to satisfy this claim. Accordingly, Debtor has not met its burden of proof that it can effectively reorganize in a reasonable amount of time. In re River East Plaza, LLC, 669 F. 3d 826, 833-34 (7th Cir. 2012) (Bankruptcy court properly dismissed case in single-asset real estate case and granted primary creditor relief from the automatic stay where creditor made an 1111(b) election opting to treat entire claim, including deficiency of approximately $25,000,000, as secured for purposes of bankruptcy plan and debtor could not provide creditor substitute collateral to satisfy the requirements of the Bankruptcy Code.)

Debtor cannot reorganize within a reasonable amount of time as it has no ability to fund operations either during or after bankruptcy. Debtor testified that the only source of Debtor's internal funds is from the sale of the Property, Debtor currently has no funds, and Debtor would rely on post-petition financing to fund the operations of the Property. In regards to post-petition financing, Debtor submitted a letter from FYM Hughes, LLC that says FYM Hughes will provide a maximum of $500,000 in Debtor in Possession Financing to Debtor provided various conditions were met by the Debtor (the "Potential Financing"). Notably, no representative from FYM Hughes testified at the hearing. This is the same "commitment" that Debtor submitted as evidence at a November 7, 2012 hearing. The Potential Financing is contingent on FYM Hughes, LLC obtaining "a priority claim over all secured creditors and a secured priority payment over the bankruptcy estate." The Potential Financing is governed by 11 U.S.C. § 364(d), which requires Debtor to provide adequate protection of FDIC-R's secured claim in the Property in order to obtain the Potential Financing. The Court finds that Debtor is not likely to obtain the Potential Financing as Debtor presented no evidence to show that it can provide FDIC-R the necessary adequate protection under 11 U.S.C. § 364(d). Debtor failed to prove that the Potential Financing would maintain or increase the value of the Property to protect FDIC-R's secured interests in the Property. In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (S.D.N.Y. 1992) (Goal of adequate protection for purposes of provision entitling Debtor to obtain

financing secured by liens senior to all other interests is to safeguard secured creditor from diminution in value of its interest.); Suntrust Bank v. Denmark Construction, Inc., 406 B.R. 683, 700-701 (E.D.N.C. 2009) (Slim equity cushion and speculative possibility of enhancement of secured creditor's collateral did not qualify as adequate protection for Debtor seeking financing on superpriority basis.); In re Mosello, 195 B.R. 277, 287-88 (S.D.N.Y. 1996) (Debtor could not provide adequate protection necessary to secured creditor necessary to obtain superpriority financing as there was only speculative benefit to secured creditor that property's value would increase more than the amount of the financing as it was not clear that the financing would increase the value of the property). In re Timber Products, Inc., 125 B.R. 433, 437 (Bankr. W.D. Pa. 1990) (Debtor not entitled to superpriority loan due to insignificant equity cushion in property securing secured creditor's lien); Matter of St. Petersburg Hotel Associates, Ltd., 44 B.R. 944, 946 (M.D. Fla. 1984) (Debtor not entitled to superpriority loan since secured creditor was already undercollateralized). To the contrary, the evidence showed that FDIC-R is already severely undercollateralized and there is no source of funding other than sale of FDIC-R's collateral (the Property), and that such sale would not generate new or replacement collateral for FDIC-R but instead would diminish FDIC-R's collateral further. Accordingly, it is unlikely Debtor could obtain superpriority funding in this case. Moreover, the Debtor has not offered any evidence that it can obtain debtor-in-possession or exit financing from any other source and it is doubtful that it could since the Debtor has no operating income, its assets are fully encumbered, and Debtor's principal, Mr. Scarfia, Sr., has recently filed personal bankruptcy. Accordingly, the Debtor has not provided evidence demonstrating that it can obtain financing or otherwise generate enough money to pay the $13,545,000 in expenses necessary to operate the Property during the life of the Sketch of Plan.

The Debtor has not shown that it will be able to meet the requirements of 11 U.S.C. § 1129(a)(10) in obtaining the approval of at least one qualified impaired class of creditors as FDIC-R is in control of all conceivable qualified voting classes and has stated that it will not vote to approve a plan filed by Debtor due to Debtor's financial performance.

In any plan submitted by the Court, assuming no § 1111(b) election, FDIC-R's secured claim will be in its own separate class in the amount of $9,920,000, the value of the Property pursuant to 11 U.S.C. § 506(a). The secured class containing FDIC-R's secured claim will be impaired and will not vote to approve any plan proposed by Debtor in this case. The deficiency for FDIC-R's secured claim on the First Loan in the amount of $22,150,760.14 and the entire claim on the Second Loan of $8,698,961.45 will be part of the unsecured class of creditors, making FDIC-R's unsecured claim $30,849,721.59 (treatment of which is discussed below). The only other secured creditor listed in Debtor's Schedules is CRIM, which cannot vote to approve a plan as a secured tax creditor entitled to priority is not an impaired creditor.

The only unsecured priority claim is held by Municipio de Bayamon. In any plan submitted to the Court, the Debtor must assign the priority tax creditors to their own unimpaired class pursuant to 11 U.S.C. § 1122. This class is not permitted to vote on any proposed plan. In re Equitable Development Corporation, 196 B.R. 889, 893 (Bankr. S. D. Ala. 1996) (holding priority tax creditors are not an impaired class eligible to vote on a plan of reorganization); Travelers Ins. Co. v. Bryson Properties XVIII, 961 F. 2d 496, 501 n. 8 (4th Cir. 1992) ("[P]riority tax claimants, which receive preferential treatment under the Code, are not an impaired class that can accept a plan and bind other truly impaired creditors to a cram down".). As to nonpriority unsecured debt, Debtor owes a total of $42,616,193.28 in unsecured debt, including $30,849,721.59 to FDIC-R. Unless it elects otherwise, FDIC-R undeniably will be in control of the unsecured class as it holds 72% of the claims in the unsecured class. Since FDIC-R is in control of more than one-third of the amount owed to unsecured creditors in this case, the unsecured class can only accept a plan if FDIC-R votes to approve a plan, which FDIC-R has stated it will not do. See 11 U.S.C. § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected such plan."). Accordingly, the unsecured class will be impaired and likely will not be voting to approve any plan proposed by Debtor in this case.

Further, insiders of Debtor hold $9,352,301.00 of the unsecured debt not held by FDIC-R and thus their votes do not count toward the one accepting class requirement of § 1129(a)(10). Gibraltar Construction, Inc. ("GCI"), a company controlled by Scarfia, is allegedly owed $9,270,801.00 by Debtor. GCI is an insider of Debtor as defined under § 101(31), which states an "insider" includes "an insider of an affiliate as if such affiliate were the debtor." Debtor is wholly-owned by Gulfcoast Irrevocable Trust IV ("Trust IV"). GCI is wholly-owned by Gulfcoast Irrevocable Trust I ("Trust I"). Michael Scarfia ("Scarfia") is the trustee and sole beneficiary of both Trust I and Trust IV (collectively, the "Trusts"). Scarfia also is the sole director and officer of Debtor. Scarfia is an affiliate of Debtor. An affiliate includes, *inter alia*, an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2). An entity includes a person pursuant to 11 U.S.C. § 101(15). In the instant case, Scarfia is in complete control of Trust IV, which holds 100 percent of Debtor's voting securities. Accordingly, GCI is an insider of Debtor. Moreover, Debtor lists unsecured claims totaling $81,500 to Gulfcoast Irrevocable Trust II, Gulfcoast Irrevocable Trust VI, and Gulfcoast Irrevocable Trust XVI. Scarfia is the Trustee of these trusts as well. Accordingly, these trusts also are insiders of Debtor. Pursuant to 11 U.S.C. § 1129(a)(10), in determining whether there is at least one class accepting a plan, the acceptance by insiders must not be considered. FDIC-R holds 93% ($30,849,721.59 of $33,263,892.28) of the unsecured claims to be considered for the purpose of determining whether or not the unsecured class has accepted a plan of reorganization. Further, if FDIC-R can only make an 11 U.S.C. §1111(b) election on the First Loan, FDIC-R would still be in control of the unsecured class by virtue of the amounts owed under the Second Loan. Specifically, FDIC-R would hold 78% ($8,709,703.97 of $11,123,874.66) of the unsecured claims considered for purposes of 11 U.S.C. §1129(a)(10) in this scenario.

The Sketched Plan outlined by Debtor at the Hearing is in contravention of the Bankruptcy Code and cannot be confirmed for the following reasons. Debtor's proposal to distribute proceeds of the sales of the Property to unsecured creditors is in violation of the absolute priority rule. As described in detail above, Debtor's assets are worth far less than the amount of FDIC-R's secured

claim. If Debtor were to "operate," it would never be able to generate more than the value of the unsold units of the Property, which are completely encumbered by FDIC-R. Therefore, all income received by Debtor through the sale of its Property would be directed to satisfy FDIC-R's right to payment. See 11 U.S.C. §1129(b)(2)(A)(1) (absolute priority rule as it applies to secured creditors); see also In re Swedeland Development Group, Inc., 16 F. 3d at 567 (3d Cir. 1994) (Court "will not hold that a debtor can achieve an effective reorganization by diminishing the value of its pre-petition creditor's lien interest" and where "the net present value of" Debtor's anticipated cash flow "would be insufficient to satisfy" secured creditor's claim.). Debtor may not circumvent the absolute priority rule to pay unsecured creditors until FDIC-R is paid in full, which is impossible in this case based on the value of the Property. The plan described by Debtor included improper gerrymandering to circumvent the requirement of 11 U.S.C. § 1129(a)(10) and the fact that FDIC-R is in control of all conceivable impaired classes. Specifically, Scarfia testified that Debtor was going to segregate the unsecured class by creating a separate class consisting only of subcontractors. Debtor may not separate FDIC-R's unsecured claims from the remainder of the unsecured claims absent a legitimate business reason. See In re Boston Post Road Ltd. Partnership, 21 F. 3d 477, 483 (2d Cir. 1994) (Debtor must provide credible proof for any legitimate reason for segregating principal creditor's unsecured claim from general unsecured claims.); In re Barakat, 99 F. 3d 1520, 1526 (9th Cir. 1996) (Debtor impermissibly classified secured creditor's deficiency claim from general unsecured claims without legitimate business reason.). Debtor has not and cannot provide a legitimate business reason to treat the subcontractors any differently than the other unsecured creditors in this case. As stated in detail above, the construction of the Property is virtually complete and the subcontractors owed money in this bankruptcy are not required to finish the units of the Property.

## CONCLUSION

The Court, based on the Findings of Fact and Conclusions of Law stated herein, hereby grants the Motion for Relief from Automatic Stay (the "Motion for Relief") filed by Federal Deposit Insurance Corporation, as receiver for Westernbank Puerto Rico ("FDIC-R") and hereby grants FDIC-R relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) in order to permit FDIC-R to

enforce its loan documents against Debtor including, without limitation, a foreclosure of the Property in the District Action as FDIC-R has proven there is no equity in the Property and Debtor has failed to prove that it can successfully reorganize in a reasonable amount of time.

SO ORDERED.

In San Juan, Puerto Rico, this 29th day of May, 2013.

Enrique S. Lamoutte
United States Bankruptcy Court